SATER, Appellant, vs. CITIES SERVICE OIL COMPANY, imp., Respondent. [Five cases.]

*March 11—June 4, 1940.*

For the appellants there were briefs by *Sachtjen, Braathen & Forkner* of Madison, and oral argument by *Austin H. Forkner*.

For the respondent there was a brief by *Olin & Butler,* and oral argument by *E. L. Wingert,* all of Madison.

The following opinion was filed April 9, 1940:

NELSON, J.   The five appeals were heard at the same time upon a single bill of exceptions.   The facts adduced by the plaintiffs, in support of their respective claims are so similar that it will not be necessary particularly and separately to state them.   Any material difference will be noted.

The defendant at all of the times to be mentioned was engaged in marketing gasoline and other petroleum products through outlets known as bulk plants, bulk stations, or tank stations.   It had a considerable number of such plants in this state.   Each of these bulk plants was in charge of an agent known as a bulk-plant agent.   A bulk plant consisted mainly of several large-capacity storage tanks and a small office or storeroom where packaged merchandise and the agent's records were kept.   Large quantities of gasoline and other products were temporarily stored there.   Sales and distributions were made by the bulk-plant agent through the instrumentality of trucks owned either by him or by others employed by him, all of which were equipped with tanks which belonged to the defendant.   The trucks were operated by employees who sold and delivered defendant's gasoline and other products at wholesale to filling-station operators, and at retail to customers in the territory allotted to them.   The agent was not a purchaser and reseller of the defendant's products, but rather an agent in charge of sales within the territory allotted to him.   His compensation was based on commissions earned.

On August 27, 1936, La Fontaine was engaged by the defendant to operate its Dane county bulk plant, located just outside the limits of the city of Madison.   He entered into a written tank-sales agent's employment agreement with the defendant wherein and whereby he agreed to devote his en-

tire time and attention exclusively to said employment, to furnish at the defendant's expense a satisfactory surety bond, to comply with instructions given him, to deliver petroleum products for cash or on credit, at prices established by the defendant, to remit for all cash sales as instructed, to report all sales, either cash or credit, made by him, to extend credit only to persons whose names were furnished him, to permit deductions from money due him for deliveries made to unauthorized customers which were not paid for at the end of each month. The contract specifically provided:

"8. That he will provide and maintain, *at his own expense,* whatever truck chassis may be necessary to make proper sale and delivery of the company's products; the company to furnish the truck tank, delivery buckets, etc.

"9. That he will employ, *at his own expense,* suitable drivers to operate such other trucks as may be necessary, in order to make proper sale and delivery of the company's products upon the following conditions:

"(a) No driver or drivers shall be employed by him except with the consent and approval of the company. Any driver employed by him shall be contracted under a driver's commission arrangement form, which is to be supplied by the company. One copy of such agreement shall be on file with the company.

"(b) All drivers shall comply with the rules and regulations of the company in a manner satisfactory to it.

"(c) Drivers not satisfactory to the company, shall be discharged by the agent upon the company's request.

"(d) That he will be *responsible to the company for the acts of his said employees,* including proper account for petroleum products intrusted to them for sale and proceeds derived from sales thereof and unauthorized sales and deliveries made by his driver or drivers, to the same extent and in the same manner, as if he had made such sales and deliveries personally.

"10. The company agrees to pay the agent the following commission rates for all sales and deliveries." (Commission rates specified.) (Italics ours.)

The contract contained other provisions which need not be recited. Attached to the contract was the following rider:

"Out of the commissions payable to agent thereunder, the sum of one-half cent per gallon on all commodities handled, shall be paid in compensation for the use and cost of operation of an automobile truck furnished by agent and used in the operation of said station. Agent shall at the end of each month report the salaries of all persons *independently employed by him,* and paid by him during the month, as well as any other outlay made by him in the conduct of said station. The balance of the commissions payable after deducting rental for the operation of said truck and other outlay paid by agent, shall be regarded as compensation for the services of the agent."

On July 12, 1937, a written contract of employment was entered into between "Cities Service Oil Co., located at Madison, Wisconsin, L. La Fontaine, agent, known as the party of the first part," and the plaintiff Sater. The contract was signed "Party of the first part: Cities Service Oil Co., L. La Fontaine," and by Sater as party of the second part. The contract, which was typewritten, was drafted by La Fontaine, who used as a form an old and similar contract which he had found in his office. The contract provided that the party of the first part agreed to employ the party of the second part as rural driver in certain territory on a specified commission basis, that the party of the first part would furnish party of the second part a truck and tank and maintain the same at all times, including gasoline and operating expenses; that the party of the first part agreed to carry all credits for the party of the second part unless made in violation of company policies; that the party of the first part would carry liability and collision insurance on the truck furnished the party of the second part; and would pay the commissions not later than the twelfth of the following month. The party of the second part agreed to devote his entire time in selling petroleum products as sold by the party of the first part, to turn in all

money collected, to drive the truck in a careful manner, etc. The party of the second part further agreed to furnish a cash bond in the amount of $150, to guarantee his honesty pertaining to collections of moneys and company's merchandise as carried by him on the truck, as per bond agreement. On the same day a cash bond for $150 was entered into. The bond agreement recited that it was "between Cities Service Oil Co., located at Madison, Wisconsin, L. La Fontaine, agent, party of the first part," and Sater; and it was signed "Party of the first part, Cities Service Oil Co. L. La Fontaine. Party of the second part A. E. Sater." Similar contracts were entered into by the plaintiffs, Matson, Sullivan, and Brumm. They were dated November 15, 1937, September 8, 1937, and November 12, 1937, respectively. Each of these contracts, however, was "between L. La Fontaine, agent for Cities Service . . . known as party of the first part," and party of the second part. The Matson and Sullivan contracts were signed: "Party of the first part, L. La Fontaine." The Brumm contract was not signed except by Brumm. The bond contracts were "between L. La Fontaine, agent for Cities Service Oil Co.," etc., and were signed: "Party of the first part: L. La Fontaine." The plaintiff Gilbertson's contract was in the form of a letter written by "L. La Fontaine, agent, Cities Service Oil Co., Madison, Wisconsin." It referred to a conversation held a few days before, and specified the commissions that would be paid for running a gasoline tank wagon in the Stoughton area, and referred to the tank which would be furnished, the carrying of charges unless deliveries were made after credit had been cut off, and other matters not here material. None of the contracts or bond agreements were filed with the defendant.

The appellants assign as error, (1) the failure of the court to hold that the defendant was liable for the commission wages which had not been paid to them and for the bond money deposited with La Fontaine; (2) the failure to hold

that the plaintiffs were the employees of the defendant; (3) the refusal to receive evidence that the defendant registered each of the plaintiffs under the Social Security Act, the Unemployment Compensation and Workmen's Compensation Acts, and that the defendant carried the liability and collision insurance on the trucks; (4) the refusal to receive certain evidence pertaining to the scope of employment of the men, customs and practices, and duties and authority of La Fontaine for the purpose of construing the several agreements; (5) and the failure to give full weight to certain testimony admitted subject to the defendant's objection.

The first two assignments of error may be considered together. Did the court err in holding that the defendant was not liable for the commission wages and bond money because the plaintiffs were not the employees of the defendant, but were the employees of La Fontaine, and because the bond money deposited was for the latter's benefit, and not for the benefit of the defendant?

It appears to us, as it did to the trial court, that the provisions of the contract entered into by La Fontaine with the defendant are clear and unambiguous. La Fontaine clearly agreed that he would provide and maintain, at his own expense, whatever truck chassis might be necessary to make proper sale and delivery of the defendant's products; that he would employ, at his own expense, suitable drivers to operate such other trucks as might be necessary in order to make proper sale and delivery of the defendant's products upon the conditions therein specified. The rider hereinbefore recited provided that at the end of each month La Fontaine would report the salaries of all persons independently employed by him and paid by him during the month. Under the terms of the contract, La Fontaine was an agent of the defendant having only such powers and authority as were granted to him. There is obviously, in the express provisions of this contract, nothing which authorizes La Fontaine to employ anyone on

behalf of the defendant, or to require anyone employed by him to furnish a cash bond. So the plaintiffs cannot recover on any theory of actual express or implied authority given to La Fontaine by the defendant to employ them or to require them to furnish a cash bond on its behalf.

Did the court err in failing to find that, under the proven circumstances, La Fontaine had apparent or ostensible authority to employ the plaintiffs on behalf of the defendant and to require that they furnish cash bonds?

The law applicable to apparent authority has been fully restated by this court in two recent cases, *Hansche v. A. J. Conroy, Inc.,* 222 Wis. 553, 269 N. W. 309, and *Sell v. General Electric Supply Corp.* 227 Wis. 242, 278 N. W. 442. We, therefore, deem it unnecessary to restate that law. It seems to us that the plaintiffs ignore some of the basic elements of the law of apparent authority. See *Hansche* and *Sell Cases, supra.* The law of those cases is in harmony with the following statement of the general rule:

"Apparent authority, or ostensible authority, as it is also called, is that which, though not actually granted, *the principal knowingly permits the agent to exercise, or which he holds him out as possessing.*" 2 Am. Jur. p. 82, § 101.

"Apparent authority to do an act may be created *by written or spoken words or any other conduct of the principal* which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." 2 Am. Jur. p. 84, § 102.

"Moreover, the apparent authority for which the principal may be liable *must be traceable to him,* and cannot be established solely by the acts and conduct of the agent; the principal is only liable for *that appearance of authority caused by himself.* . . . Furthermore, a party dealing with an agent must prove that the facts giving color to the agency were known to him when he dealt with the agent, and that he believed the agent was acting within his authority; if he has no knowledge of such facts, he does not act in reliance upon them and is in no position to claim anything on account of them. For this reason, it is plain that one who deals with

an agent as principal cannot set up the agent's apparent authority, on which he did not rely, so as to establish rights against the principal." 2 Am. Jur. p. 85, § 103.

A careful review of the whole record reveals no act on the part of the defendant which tends to show that the defendant did anything, before or at the times the plaintiffs were employed, to hold out to them that La Fontaine possessed authority to employ them as employees of the defendant or possessed authority to require them to furnish cash bonds. There is in the record nothing to show any conduct on the part of the defendant, its executives, or managerial officers which, reasonably interpreted, could be the basis for a belief on the part of the plaintiffs, at the time they entered into the contracts, that the defendant consented to their employment on its behalf.

The practical construction given to the contracts by the plaintiffs, lends further support to the trial court's conclusions. Whatever commissions they did receive were paid to them by La Fontaine's personal check. When pay days arrived and their commissions were not paid they took the matter up with La Fontaine. They did not ask the defendant to pay them until several months had elapsed and considerable amounts of unpaid commissions had accumulated. In other words, they looked to La Fontaine for their pay, not to the defendant.

The trial court, apparently for the purpose of affording the plaintiffs every opportunity to support their claims, received considerable testimony relating to subsequent declarations, claimed to have been made by other agents of the defendant to the plaintiffs, long after the plaintiffs' contracts were entered into. Matson testified that Alleman, a field supervisor, told him that he was working for a good company. Gilbertson testified that Alleman asked him on one occasion:

"How do you like to work for the Cities Service Oil Company, or something like that?"

Other similar statements were adduced, all of which were denied by the person who, it was asserted, had made them.

La Fontaine was discharged shortly after the defendant learned that he was not paying his employees. La Fontaine was produced as a witness by the plaintiffs and was, to say the least, a willing witness in their behalf. Much of his testimony was incompetent. An agent's authority may not be shown by his declarations. *Gunsten v. Gordon*, 160 Wis. 481, 483, 152 N. W. 187; 3 Page, Contracts, p. 3025, § 1761.

As to the cash bonds which La Fontaine required the plaintiffs to put up, it appears that he told the plaintiffs that the furnishing of bonds was a company requirement, and that the money would be deposited in a bank and draw bank-rate interest. It clearly appears that the company required no bond of La Fontaine's employees. La Fontaine testified that he did tell someone in authority about getting cash bonds, and he was told it would be all right, and that he could go ahead and do it, but, he testified:

"I explained about getting protection for myself. I had no protection on the Fidelity bond. I can't recall all the conversation, just the general outline that I explained to them according to the bond,—the Fidelity bond,—because the company got the protection and that it gave me none whatsoever; and they were holding me for the merchandise. I should have a little protection on the bond too. I felt I should have a bond where I could get a little protection out of the thing as well as the company."

This testimony clearly reveals in whose interest the bonds were taken and for whose benefit.

The plaintiffs contend that under the contract between the defendant and La Fontaine, it should be held as a matter of law that the plaintiffs were the employees of the defendant, and that it should be held that the defendant is liable for the commissions which La Fontaine failed to pay. We think the contention unsound. While, under the contract, La Fontaine was the agent of the defendant, we think it clear that the

plaintiffs were his employees, not the employees of the defendant. A contract substantially like the one here was construed in *Texas Co. v. Brice* (C. C. A.), 26 Fed. (2d) 164. Recovery of damages from the Texas company was there sought on the ground that a truck driver employed by one of its commission agents had negligently caused the death of the plaintiff's intestate. In that case, the defendant knew of and consented to the employment of such driver by its commission agent. It was there said:

"It is, indeed, sometimes loosely stated in textbooks and even in opinions by courts that consent by a principal that his agent may employ agents makes the agents so employed the subagents of the principal, so as to fasten upon him liability for their acts within the scope of their employment. That, however, is too broad a statement of the applicable rule, because it overlooks the important distinction between a principal's consent, on the one hand, that his agent may employ an agent or servant on behalf of the principal, and the principal's mere consent, on the other hand, that the agent may employ his own agent or servant, who may even assist him in performing his duties to said principal, but who remains, nevertheless, the representative of only his immediate employer, and stands in no relation to the principal of such employer. Prof. Mechem, in his admirable treatise on the law of agency, has in the following language well pointed out the true principles involved (pages 240, 242, 1447):

" 'The principal may, of course, authorize the employment of the subagent on his account and as his agent and thus create privity of contract between them. But he may also do less. He may occupy a middle ground. He may clearly be willing to consent that his agent may perform the duty through a substitute employed at *the agent's* risk and expense, when he would not be willing, at *his own* risk and expense, to have such a substitute employed. . . .

" 'The principal may consent to the employment of subagents on such terms as please him, and, where he has consented only upon the express or implied condition that the subagent shall not be deemed his agent, that condition, as between the parties, must control. . . . In order to justify the inference of an employment as the principal's agent, the

circumstances must be such as to reasonably warrant the conclusion that the principal has taken the subagent as his agent, thereby ordinarily becoming liable for his compensation, assuming responsibility for his conduct, accepting the subagent's responsibility to him, and releasing the original agent from such responsibility.' "

But one other contention deserves consideration. Was it error for the trial court to refuse to permit the plaintiffs to show that the defendant listed the plaintiffs for purposes of social security, unemployment compensation, and workmen's compensation, and carried the liability and collision insurance on the trucks? In our opinion, the trial court committed no prejudicial error in so ruling. Even assuming that the defendant did list the plaintiffs for purposes of unemployment compensation and social security, that fact would be of little controlling materiality in view of the fact that both those laws had been recently enacted and had received but scant construction. In view of the indefinite scope of those acts, and the uncertainty that existed regarding their true and correct meaning, the defendant might well have preferred to play safe rather than to run the risk of becoming involved in litigation and possibly having penalties imposed upon it. Then, too, contention might have been made that the language of sec. 108.02 (c), Stats. 1935 (Unemployment Compensation Act), was sufficiently broad to make it applicable to situations such as here existed. Likewise, under the provisions of sec. 102.06, Stats. 1935 (Workmen's Compensation Act), it might have been contended that under the situations that here existed, the defendant would be liable for compensation and it was virtually certain that sec. 102.07 (4) Stats. 1935, rendered the defendant liable to the plaintiff for compensation. Under all of the circumstances, we conclude that the testimony offered was of little or no relevancy and certainly did not prejudice the plaintiffs. The facts sought to be adduced were unknown to the plaintiffs at the time they entered into the several contracts and therefore

could not have been material on the issue of apparent authority.

We conclude that the trial court was right in holding that the plaintiffs never became the employees of the defendant; that the defendant never became indebted to them for the earned commissions which La Fontaine failed to pay them, and that the moneys put up with La Fontaine as cash bonds resulted in no liability on the part of the defendant.

*By the Court.*—The mandate in each appeal is,—Judgment affirmed.

Motions for rehearing were denied, with $25 costs in one case only, on June 4, 1940.