**AMPLICON, INC., Plaintiff,**

v.

**MARSHFIELD CLINIC, Defendant and Third–Party Plaintiff,**

v.

**BERRY COMPUTER INC. and Deutsche Credit Corp., Third–Party Defendants.**

No. 91–C–0462–C.

United States District Court,
W.D. Wisconsin.

Feb. 3, 1992.

**1470**

Anthony R. Varda, Porter DeWitt, Madison, Wis., for Amplicon, Inc.

Roy L. Prange, Jr., Quarles & Brady, Madison, Wis., for Marshfield Clinic.

Frederick A. Bohling, Daly, Bohling & O'Connor, Eagan, Minn., for Berry Computer Inc.

Patricia Gibeault and Axley Brynelson, Madison, Wis., for Deutsche Credit Corp.

CRABB, Chief Judge.

Amplicon brought this contract action against Marshfield, alleging that Marshfield is in breach of its lease agreement. Presently before the court is Amplicon's motion for summary judgment. Amplicon contends that the undisputed facts establish as a matter of law that Marshfield owes a deposit and interim rent pursuant to the lease agreement. Amplicon contends further that it is entitled to the title documentation relating to the equipment in the lease or, in the alternative, to such amounts as were deducted by Marshfield and paid to Amplicon's suppliers. Marshfield denies that it is liable for a deposit and interim rent, and contends that it has paid all amounts required to be paid with respect to the lease. Marshfield argues that Berry Computers, acting as the apparent agent of Amplicon, fraudulently induced Marshfield into entering this contract on terms that are inconsistent with those that were represented by Berry to Marshfield.

I conclude that Marshfield is unable to adduce sufficient evidence to show that Berry was acting as the apparent agent of Amplicon or that even if it was, its representations would have fraudulently induced Marshfield to enter into the lease agreement. I conclude also that this lease agreement was unambiguous and that the plain terms of the agreement provided for a deposit and interim rent to be paid by Marshfield. When Marshfield failed to tender payment, it was in breach of the lease agreement.

For the sole purpose of deciding plaintiff's motion for summary judgment, I find the following material facts to be undisputed.

UNDISPUTED FACTS

Amplicon is located in Santa Ana, California and specializes in leasing business equipment. Marshfield Clinic is a medical clinic located in Marshfield, Wisconsin. Berry Computer is a computer leasing and remarketing company with its principal place of business in Burnsville, Minnesota. Deutsche Credit Corporation is a commercial lender with its principal place of business in Deerfield, Illinois.

Typically, Amplicon funds its equipment purchases or assigns the lease payments to banks or other financial institutions. Berry specializes in the remarketing of Amdahl computers, a process that involves selling used equipment. Deutsche Credit Corporation is a large commercial lending institution that purchases equipment leases on the secondary market.

In the fall of 1990, Marshfield selected an Amdahl computer system to replace the existing computer system at the Marshfield Clinic. The computer was installed completely by November 19, 1990, with the exception of a compiler. Pursuant to the Amdahl contract with Marshfield, Marshfield had 30 days after installation to evaluate and test the system and, at the end of the 30 days, to render full payment.

Marshfield hoped to obtain tax advantages by leasing the computer equipment. In early December 1990, Ron Pfannerstill, the Financial Director of Marshfield, contacted various equipment leasing companies to request proposals for leasing of the computer equipment installed by Amdahl. An employee of Midland Financial Services,

Gerard Ponce de Leon, forwarded Marshfield's request for proposals to Berry, which made an initial proposal for a 60 month term on December 13, 1990. On December 17, 1990, Michael G. Stephens, the Regional Marketing Director for Berry, provided an addendum to the original financing proposal giving the following monthly payment schedule for the following terms:

| Terms | Monthly Payment |
|---|---|
| 48 months | $113,516.51 |
| 36 months | $141,220.85 |

On December 20, 1990, Berry faxed to Ron Pfannerstill a copy of the form lease Berry proposed to cover the transaction. Berry had not been involved previously with this form of operating lease and adopted the lease agreement form of Amplicon almost verbatim. The proposed forms included a schedule that had blanks for "initial base term in months," "deposit," and "monthly rent." The Berry form provided specifically that it was first to be signed by Marshfield as an offer, thereafter to be accepted by Berry to form the contract.

During December, 1990, eight companies, including Berry, submitted leasing proposals to Marshfield. Ron Pfannerstill directed his subordinates and Marshfield's attorneys to do various analyses of the proposals. The contract terms and conditions were sent for analysis to the legal department. Reed Hall, in-house General Counsel of Marshfield, assigned the contract analysis to Patti Haney, a staff attorney for Marshfield.

In late December 1990, Amdahl's lawyers contacted Marshfield demanding payment that they believed was due on December 18. Marshfield asserted that the computer system was not complete until it received installation of a portion of the software system and therefore payment was not yet due because the system did not run in its entirety until December 19, 1990. Amdahl agreed to wait until January 18, 1991, for payment.

On January 3, 1991, Haney wrote a ten-page memo to Hall and Pfannerstill with comments on 15 separate sections of the lease that she pointed out as significant or possibly negotiable. The memo contained no reference to interim rent under the Berry lease. One note read:

3. Berry Computer lease proposal.

... B. Section 3 ... Any deposit made by the lessee to the lessor will be treated as down payment to be applied to the cost of the lease property. This may be negotiated to be applied to the first rental payment rather than the possible purchase.

Marshfield began to focus on the Berry proposal to refine it into a contract.

On January 1, 1991, Gerard Ponce de Leon became an employee of Berry and was assigned to handle the Berry lease with Marshfield. The lease was to be sold to Amplicon in the secondary market.

On January 14, 1991, Ron Pfannerstill reviewed the form lease contracts and made a note to himself that read:

3. Rentals—

Explain re qtr periods + commencement date

Berry advised Marshfield that Amplicon would be the lessor under the proposal. This was confirmed in writing in a letter dated January 17, 1991. On January 14, 1991, David Brill, Vice President and Regional Manager of Amplicon, began negotiating directly with Haney at Marshfield regarding amendments to the Amplicon form contract. On that same day, Amplicon received the first draft of the Addendum "A" proposed by Marshfield as an amendment to Amplicon's lease form and David Brill spoke directly with Haney by conference call. Employees of Berry (Guy Klingler and Gerard Ponce de Leon) participated in the phone call.

Marshfield proposed a series of amendments: Brill of Amplicon and Haney of Marshfield negotiated most of the amendments, communicating by telephone and fax machine.

On January 16, 1991, Guy Klingler of Amplicon wrote Ponce de Leon requesting that he obtain various documents from Marshfield, including a deposit check of $113,516.53. Ponce de Leon had no idea at that time what the deposit was for and did

not learn about it until after he left Berry in March of 1991. On January 16, Christine Berry, Vice President of Berry, advised Haney by letter that Marshfield was required to provide:

the following additional items with the signed lease agreement:

1. One bank reference;
2. Three trade references;
3. Three years audited financial statements, plus interims, if available; and
4. A deposit check in the amount of $113,516.53.

Included with the January 16 letter to Haney were a copy of the Amplicon Lease Agreement, order and Lease Schedule number one, Addendum "A" (the negotiated changes from the form contract), Addendum "B" (the casualty law schedule), and Addendum "C" (the fair market value buy out option proposal).

On January 16, Haney negotiated with David Brill various additional changes to the proposed Addendum "A." The Amplicon Lease Schedule forwarded to Haney included a Schedule that showed the following:

| INITIAL BASE TERM IN MONTHS | DEPOSIT | DEPOSIT TO REDUCE LEASED PROPERTY COST BILLED MONTHLY | MONTHLY RENT |
| --- | --- | --- | --- |
| 48 | $113,516.53 | | $113.516.53 |

---

Near the close of the day on January 16, Haney turned over the transaction to Reed Hall. That evening, Hall reviewed the various lease documents in preparation for signing them on January 17.

On January 17, Berry provided Marshfield with an unsigned proposed Non–Circumvention Agreement between Berry and Amplicon that was prepared by Christine Berry. It provided in part:

Agreement dated January 8, 1991, between Amplicon Financial (AMPLICON) and Berry Computer Incorporated (BERRY)

Hereby agree that BERRY will introduce a valuable investor.

AMPLICON acknowledges the importance of BERRY'S ongoing relationship with this investor.

In recognition thereof, AMPLICON warrants and represents that it will address to BERRY all questions and/or requirements which it may have with respect to lease transactions, currently being negotiated or as any other contracts available in the future.

Amplicon refused to sign the agreement proposed by Berry and negotiated a different form of the agreement. Berry and Amplicon each executed in counterpart the final Non–Circumvention Agreement on January 23 and January 29, respectively. It provided in relevant part:

Berry shall be responsible for obtaining an initial Lease application from the customer, properly executed, which shall include, at a minimum, a Master Lease, a Property Schedule, a transaction check, three years of audited financial statements, interim financial statements, one bank reference, and three trade references.

\* \* \* \* \* \*

Berry agrees not to quote any Amplicon lease rates to the customer without Amplicon's prior approval, and furthermore shall not give the Lessee any agreements, whether written or oral, or negotiate any terms and conditions on Amplicon's behalf, without Amplicon's prior approval.

On January 17, Charles Berry faxed a letter to Pfannerstill at Marshfield indicating that the lease agreement between the companies would be written on documents from Berry's investor, Amplicon Financial. Charles Berry added that:

All servicing and administrative aspects of this lease transaction will be done strictly between our companies, with the exception of billing done by and payments made to our investor. This means that any questions regarding the equipment, upgrade of same and/or provisions for expanding or buy out at the end of the lease would be directed to and responded by us at Berry Computer.

On January 17, Berry's employees, Stephens and Ponce de Leon, went to Marshfield to pick up a signed lease agreement. When they arrived at Marshfield, there was further discussion about amending Addendum "A" to provide for a fair market value buy out as well as a cap on the equipment purchase price. After discussions with Marshfield, Ponce de Leon had to excuse himself from the meeting to telephone Amplicon for approval for making the requested changes in the offer.

The lease documents were executed by Dr. Leer, President of Marshfield Clinics, and given to Ponce de Leon for forwarding to Amplicon. Dr. Leer did not read the documents but signed the offer on the advice of counsel and staff.

Prior to the Marshfield signing, Ponce de Leon had no discussions with anyone from Amplicon or Marshfield regarding interim rent. Ponce de Leon stated:

We presented a proposal and you presented the lease, it's not my responsibility to review that. I am not counsel ... All I'm doing is representing Berry Computer and proposing a rate per month. The rest of the terms and conditions, accounting and legal, of that contract are not my responsibility. That's Marshfield's responsibility and Amplicon's responsibility. They agreed. There was an opinion of counsel signed by Marshfield. So if Marshfield agreed to the terms and conditions on the contract, really it's not my responsibility to review or have knowledge of the other terms and conditions that I'm not familiar with.

It is not Berry Computer's practice to explain any requirements for interim rent with respect to a lease transaction unless a customer asks about it because computer users are familiar with the concept of interim rent. Prior to the Marshfield lease transaction, Berry had never been involved in a lease of this magnitude involving a third party investor or lease financier such as Amplicon.

Ponce de Leon was given a Marshfield check made out in the amount of $113,-516.53 to submit to Amplicon. The attached check stub indicated on its face that it was "to be applied to first month rental payment."

As of January 17, none of Berry's representatives had read or analyzed Amplicon's form leases. Haney, Hall and Pfannerstill had read and reviewed the lease documents. During the January 17 meeting at Marshfield, all of the employees of Marshfield knew that Ponce de Leon and Stephens were not officers of Amplicon. On that same day, Ponce de Leon and Stephens returned to Minneapolis with the paperwork where it was assembled and forwarded to Amplicon the following day.

On or about January 28, Brill wrote to Haney stating that she should not date certain lease documents, including a Delivery Order and a Notification to Lessee of Assignment of Lease because Amplicon would do so to "provide a consistent date."

Between January 23 and January 31, Amplicon made arrangements to resell the lease on the secondary market to Deutsche and, in addition, negotiated further changes to proposed Addendum "A" to the lease. On January 30, Marshfield accepted and agreed to the assignment of the Lease to Deutsche.

On January 29, Amplicon forwarded to Marshfield a letter with enclosures, that read:

This letter will serve as your formal notification that the above referenced transaction has been approved by the Ampli-

con, Inc. Finance Committee. In addition, it is hereby confirmed that the terms of the transaction(s) are set forth in *Lease Agreement Order (which has been assigned No. OL–5387), revised Addendum "A" and Exhibit "A" enclosed, Lease Schedule 1 and that the Amplicon, Inc. approval is subject to the execution and return of the revised Addendum "A", Exhibit "A" and all other enclosed documents.*

On January 31, Marshfield executed and forwarded to Amplicon a letter (requested and drafted by Amplicon) which stated:

This letter confirms that the lease property referenced in the above-mentioned lease agreement was fully installed on December 19, 1990, and is now tested and ready for use and payment to vendors is appropriate. We understand that lease payments will begin on February 1, 1991, the date which you indicated the equipment would be funded. Additionally, to the best of my knowledge, there are no outstanding liens on the property.

On January 31, 1991, the revised Addendum "A" referencing the revised Non–Circumvention Agreement was executed by Marshfield and Amplicon and made a part of the contract. It did not deal with the issues of a deposit or interim rent. The transaction was funded as of February 1, 1991, and Amdahl was paid on that date.

The original Delivery Order document provided to Marshfield by Amplicon and signed by Marshfield did not indicate a commencement date. The original Notification to Lessee of Assignment of Lease bearing a typewritten date of January 23, 1991 and provided to Marshfield by Amplicon indicated that 47 monthly payments were being assigned to Deutsche but left blank the date upon which Marshfield was to begin making payments to Deutsche. The assignment was signed by Marshfield on January 30 and forwarded to Amplicon.

Ted Flati, Assistant Vice President of Amplicon, placed the words "date of funding" in the Commencement Date slot on the Delivery Order and placed the date "5/1/91" in the blank indicating the date on which the first payment of the 47 payments was to be sent to Deutsche.

On February 13, Marshfield received Amplicon's invoice for interim rent for February and March 1991, in the amount of $227,033.06. Marshfield disputed that any interim rent was due and asserted that the check given to Amplicon through Berry on January 17 was payment of the first month's rent and not the deposit otherwise indicated on the lease schedule. Marshfield asserted further that no deposit was required with respect to the transaction.

On February 26, 1991, Amplicon forwarded a ten-day "right to cure" letter to Marshfield declaring the lease in default for failure to pay interim rent in the amount of $227,033.06. Marshfield declined to pay the interim rent.

The provisions of the signed lease agreement relevant to this case are as follows:

**21. AGREEMENTS:** This is the complete agreement by and between the parties hereto. **NO ORAL OR WRITTEN AGREEMENT, GUARANTY, PROMISE, CONDITION, REPRESENTATION, OR WARRANTY SHALL BE BINDING UNLESS MADE A PART OF THIS LEASE BY DULY EXECUTED ADDENDUM. . . .**

Directly above the signature line reads: **THIS LEASE CAN ONLY BE MODIFIED BY WRITTEN ADDENDUM DULY SIGNED BY PERSONS AUTHORIZED TO SIGN AGREEMENTS ON BEHALF OF LESSEE AND BY A DULY AUTHORIZED OFFICER OF AMPLICON, INC.**

Paragraph two of the lease agreement contains the provisions relating to the commencement date and the initial base term of the lease:

**2. TERM:** This lease, with respect to Schedule(s), shall become effective upon acceptance by Lessor and the term of any Schedule(s) shall commence on the date that the manufacture/vendor/licensor certifies that the leased property has been delivered to and is usable by Lessee ("Commencement Date").

\*　\*　\*　\*　\*　\*

The initial base term of the Lease, with respect to any Schedule(s), shall be as indicated on the respective Schedule(s) and shall be calculated from the first day of the calendar quarter following the Commencement Date ("Initial Base Lease Term"). A calendar quarter means a three-month period commencing on January 1, April 1, July 1, or October 1 of any calendar year.

Paragraph three of the lease agreement provides for interim rent and a deposit:

**3. RENTALS:** The monthly rent payable shall be the amount shown on each Schedule(s). Lessee shall pay to Lessor the monthly rent, in advance, for each month or any part thereof that this Lease, with respect to said Schedule(s) in effect. The first such payment shall be made on the first day of the calendar quarter following the Commencement Date. A prorata portion of the monthly rental charges based on the daily rental of one-thirtieth ($\frac{1}{30}$th) of the monthly rental calculated from the Commencement Date to the end of the calendar quarter, shall be due and payable at the Commencement Date.

\* \* \* \* \* \*

Unless otherwise delineated on the respective Schedule(s), any deposit made by Lessee to Lessor shall be treated as a down payment to be applied to the costs of the Leased Property.

## DISPUTED FACTS

The following facts are disputed by the parties but because they are not material to interpretation of this contract, they do not preclude a decision on plaintiff's summary judgment motion.

David Brill of Amplicon contends that he specifically advised Haney of Marshfield that only Amplicon could negotiate the terms of the lease with Marshfield. Haney does not recall whether such specific admonition was made.

Hall of Marshfield contends that he had a specific discussion with Ponce de Leon of Berry on January 17, 1991, in which Ponce de Leon confirmed that there was no depos-it to be applied to reduce the purchase price and that there was no reason to amend the documents to reflect that understanding. Ponce de Leon denies that he had any discussion with Hall on January 17 regarding the deposit required under the Lease.

Christine Berry testified that the package of signed lease documents forwarded to Amplicon on January 18 included the Marshfield check with the attached stub indicating that it was "to be applied to first month rental payment." Guy Klingler of Amplicon testified that there was no stub attached to the check Marshfield submitted with the lease documents.

## OPINION

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 (7th Cir.1989). When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). Also, if a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the opposing party is proper. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

Marshfield's arguments in support of its efforts to avoid paying the deposit and interim rent rise or fall on Marshfield's allegation of representations by Berry. These alleged representations were made before the signing of the lease documents and can be considered only if they fall within the exception to the parol evidence rule.

*Parol Evidence Rule*

The parol evidence rule in Wisconsin can be stated as follows:[1]

> When the parties to a contract embody their agreement in writing and intend the writing to be the final expression of their agreement, the terms of the writing may not be varied or contradicted by evidence of any prior written or oral agreement in the absence of fraud, duress, or mutual mistake.

*FDIC v. First Mortgage Investors*, 76 Wis.2d 151, 156, 250 N.W.2d 362 (1977).

■ In determining whether the parol evidence rule can be invoked in this case, the initial determination is whether "[the parties] intended the written agreement to be final and complete or 'integrated' or whether they intended any prior agreements to be part of their total agreement." *FDIC v. First Mortgage Investors*, 76 Wis.2d at 157, 250 N.W.2d at 366. If the parties included a "merger" clause in their agreement, evidence of prior oral or written representations is generally not admissible, absent one of the exceptions to the rule:

> [E]vidence of contemporaneous or prior agreements, written or oral, which relate to the same subject matter as the agreement in question is not admissible when the written agreement embodies written terms excluding additional understandings or agreements not contained in the writing, *i.e.*, "merger" clauses.

*In re Spring Valley Meats, Inc.*, 94 Wis.2d 600, 608, 288 N.W.2d 852, 855 (1980).

■ The lease agreement contains two clauses that constitute "merger" clauses. The first appears in paragraph 21 of the agreement and provides, "[t]his is the complete agreement by and between the parties hereto. **NO ORAL OR WRITTEN AGREEMENT, GUARANTY, PROMISE, CONDITION, REPRESENTATION, OR WARRANTY SHALL BE BINDING UNLESS MADE A PART OF THIS LEASE BY DULY EXECUTED ADDENDUM.**" The second clause was written directly above the signatures of the parties and reads, **"THIS LEASE CAN ONLY BE MODIFIED BY WRITTEN ADDENDUM DULY SIGNED BY PERSONS AUTHORIZED TO SIGN AGREEMENTS ON BEHALF OF LESSEE AND BY A DULY AUTHORIZED OFFICER OF AMPLICON, INC."**

These clauses evidence the desire of the parties to consider the agreement to be integrated. As such, parol evidence can be invoked only if an exception to the parol evidence rule applies. Marshfield attempts to circumvent the parol evidence rule by asserting that it was fraudulently induced into entering this lease agreement. Because Marshfield's allegations of fraud center around representations made by Berry representatives, the question whether Marshfield was induced fraudulently to enter into this lease agreement is relevant only if Berry was the apparent agent of Amplicon.

*Apparent Agency*

■ Marshfield contends that Berry representatives Gerard Ponce de Leon and Michael Stephens had apparent authority to negotiate on behalf of Amplicon on January 17, 1991. An apparent agency exists if all of the following elements are present: 1) acts by the agent or principal justifying belief in the agency; 2) knowledge of such acts by the parties sought to be held; and 3) reliance on the apparent agency consistent with ordinary care and practice. *Larkin v. Johnson*, 67 Wis.2d 451, 457, 227 N.W.2d 90, 94 (1975). The principal has to have acted affirmatively in establishing the apparent agency: "[T]he apparent authority for which the principal may be liable *must be traceable to him*, and cannot be established solely by the acts and conduct of the agent; the principal is only liable for *that appearance of authority caused by himself*." *Sater v. Cities Service Oil Co.*, 235 Wis. 32, 40, 291 N.W. 355, 359 (1940).

■ Neither Amplicon's nor Berry's actions justified a belief in an apparent agen-

---

1. Pursuant to Addendum "A," § 21, the parties have agreed that Wisconsin law governs interpretation of this lease agreement.

cy. Important negotiations over the lease agreement and its Addendum "A" were held between an officer of Amplicon, David Brill, and one of Marshfield's attorneys, Patti Haney. At the January 17, 1991 meeting at Marshfield, Ponce de Leon had to telephone Amplicon to gain Amplicon's approval of negotiations that had taken place between Ponce de Leon and Marshfield. This behavior does not evince a belief that he was an agent of Amplicon.

Whether Ponce de Leon represented to Marshfield that no deposit was required is a disputed fact. However, even if Ponce de Leon made the representation, there is no allegation that Amplicon knew that he had made it. Although Amplicon knew that Ponce de Leon was having discussions with Marshfield regarding the lease agreement, Amplicon knew also that Ponce de Leon would call Amplicon for approval when negotiations approached a point at which changes in the agreement were sought. None of the undisputed facts establish that Amplicon knew of acts by Berry representatives that would have given rise to Marshfield's belief in an apparent agency.

With respect to the third element, Marshfield bore the onus of adducing sufficient facts to show that it relied on an apparent agency with ordinary care and prudence. Marshfield had two lawyers, Haney and Hall, and a certified public accountant, Pfannerstill, review and analyze the lease agreement. It should have been aware of the provisions in the lease requiring a deposit and interim rent. It is not reasonable to ignore these provisions or neglect to bring them to the attention of an Amplicon officer in the course of negotiations, and to rely instead on a statement by Ponce de Leon. Marshfield knew that Ponce de Leon had called Brill previously when he needed approval of other changes in the lease. That should have served as an indication that Ponce de Leon lacked the authority to approve changes in the agreement.

Marshfield relies on the following facts as indicating an apparent agency: 1) until January 14, 1991, all of the negotiations were conducted between Marshfield and Berry; 2) the unsigned Non–Circumvention Agreement (later rejected by Amplicon) provided that Berry would do the negotiating; 3) Amplicon did not handle the signing of the documents directly; and 4) Amplicon knew that Marshfield preferred to deal through Berry.

These facts indicate a "middleman" relationship at the most. Ponce de Leon stated that he was not involved in the legal end of the negotiations; he was there to handle the preliminary negotiations. Once the negotiations became more serious, Amplicon stepped in to approve. Amplicon's electing not to attend the signing does not establish that it believed Berry to be its agent. Attending a signing of documents is not as important as being available should any problems arise at the signing. In this case, problems arose with respect to the issue of fair market value and Amplicon was available for consultation and approval of the changes.

I conclude that Marshfield has not adduced enough evidence to support the existence of an apparent agency between Amplicon and Berry. Although this finding makes it unnecessary to determine whether any fraudulent misrepresentations were made by Berry, I conclude that even if Berry were the agent of Amplicon and made fraudulent misrepresentations to Marshfield in the course of that agency, Marshfield could not have relied reasonably upon them.

*Fraudulent Misrepresentation*

To state a claim of fraudulent misrepresentation, Marshfield must establish that its reliance on the alleged misrepresentations was reasonable or justifiable. *Williams v. Buick,* 44 Wis.2d 239, 245, 246, 170 N.W.2d 807, 810 (1969). "Negligent reliance is not justifiable." *Bank of Sun Prairie v. Esser,* 155 Wis.2d 724, 732, 456 N.W.2d 585, 589 (1990). Marshfield contends that it relied on statements by Ponce de Leon that no deposit was required and that only a certain number of payments would be due. Even if Ponce de Leon made the statement, I could not find fraudulent misrepresentation in this case.

Similar allegations of fraudulent misrepresentation in a contract dispute were addressed in *One–O–One Enterprises, Inc. v. Caruso*, 848 F.2d 1283 (D.C.Cir.1988). The contract contained a provision that stated that the agreement "supersede[d] any and all previous understandings and agreements." The court stated that "therefore, when the representations were superseded by the Agreement, there was no representation upon which plaintiffs could [reasonably] base a fraud claim." *Id.* at 1286–87. The court commented further:

we have here the case "of a party with the capacity and opportunity to read a written contract, who [has execute[d]] it, not under any emergency and whose signature was not obtained by trick or artifice": such a party, if the parol evidence rule is to retain vitality, "cannot later claim fraud in the inducement."

*Id.* at 1287 (quoting *Management Assistance, Inc. v. Computer Dimensions, Inc.*, 546 F.Supp. 666, 671–72 (N.D.Ga.1982), *aff'd mem. sub nom. Computer Dimensions, Inc. v. Basic Four*, 747 F.2d 708 (11th Cir.1984). Similarly, in *Carlock v. Pillsbury*, 719 F.Supp. 791, 829 (D.Minn. 1989), the court concluded that "a party cannot reasonably rely upon allegedly fraudulent promises which are directly contradicted by the terms of ... a subsequently executed contract."

The reasoning in *One–O–One Enterprises* and in *Carlock* is persuasive. Even if Berry misrepresented the conditions and terms of the lease agreement, it would have been unreasonable for Marshfield to rely on those misrepresentations. Marshfield's attorneys analyzed and reviewed the agreement, which provided for a deposit and interim rent.

*Interpretation of the Lease Agreement*

The existence of a merger clause and the lack of an exception to the parol evidence rule preclude Marshfield from invoking extrinsic evidence. Therefore, this motion must be decided by interpretation of the lease agreement itself.

■ The construction of language in a written contract is generally a question of law. *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 151 Wis.2d 608, 614, 445 N.W.2d 689, 691 (1989). "[T]he language of a contract must be understood to mean what it clearly expresses, and the courts may not depart from the plain meaning of a contract when it is free from ambiguities." *In the Matter of the Voluntary Assignment of Watertown Tractor & Equipment Co. v. Ford Motor Credit Co.*, 94 Wis.2d 622, 289 N.W.2d 288, 295 (1980) (quoting *Bousfield v. Hardware Dealers Mutual Fire Insurance Co.*, 24 Wis.2d 10, 14, 127 N.W.2d 765, 768 (1964)).

Marshfield contends that it agreed to only 48 monthly payménts, beginning on February 1, 1991, and that no deposit was due. Amplicon seeks the enforcement of what it believes were express and unambiguous terms that required Marshfield to pay a deposit and interim rent.

Paragraph 3 of the lease agreement provided for interim rent, as well as the date that the first monthly payment would begin:

Lessee shall pay to Lessor the monthly rent, in advance, for each month or any part thereof that this Lease, with respect to said Schedule(s) is in effect. *The first such payment shall be made on the first day of the calendar quarter following the Commencement Date. A pro-rata-portion of the monthly rental charges based on the daily rental of one-thirtieth ($\frac{1}{30}$th) of the monthly rental calculated from the Commencement Date to the end of the calendar quarter, shall be due and payable at the Commencement Date.* [Emphasis added].

Paragraph 2 of the lease agreement also defined "Commencement Date" and "Calendar Quarter":

This Lease, with respect to Schedule(s), shall become effective upon acceptance by Lessor and *the term of any Schedule(s) shall commence on the date that the manufacturer/vendor/licensor certifies that the leased property has been delivered to and is usable by Lessee* ("Commencement Date"). [Emphasis added].

\*　　\*　　\*　　\*　　\*　　\*

The initial base term of the Lease, with respect to any Schedule(s), shall be as indicated on the respective Schedule(s) and shall be calculated from the first day of the calendar quarter following the Commencement Date ("Initial Base Lease Term"). *A calendar quarter means a three-month period commencing on January 1, April 1, July 1, or October 1 of any calendar year.* [Emphasis added].

█ Marshfield notified Amplicon that the property was usable as of January 31, 1991. February 1, 1991 was the agreed funding date. Marshfield argues that when Amplicon inserted the "date of funding," *i.e.*, February 1, as the "commencement date" on the delivery order, the terms of the agreement were altered materially. However, the agreement allowed for insertion of applicable lease dates in paragraph 19: "Lessee further authorizes Lessor to insert in each Lease Schedule and in other appropriate documentation ... applicable Lease dates and assignment dates as necessary to complete such supplemental documentation." Moreover, Amplicon's insertion of February 1 as the "commencement date" was consistent with the terms of the agreement that provided that the contract terms would commence on the date that the leased property was certified as usable by the Lessee.

█ Because the commencement date was February 1, the first day of the next calendar quarter was April 1. The agreement stated that monthly payments would begin on the first day of the calendar quarter following the commencement date. Therefore, Marshfield's monthly payments were to begin on April 1, 1991. The prorata portion of the monthly rental charges was to be calculated from the period between February 1, 1991 and April 1, 1991,

and the pro rata payment was due on February 1, 1991.[2]

With respect to the provisions of the lease agreement relevant to a deposit, paragraph 3 of the agreement states that "[u]nless otherwise delineated on the respective Schedule(s), any deposit made by Lessee to Lessor shall be treated as a down payment to be applied to the costs of the Leased property." The lease schedule showed that a deposit of $113,516.53 was due and this deposit statement was printed clearly above the signatures of the parties. Although the deposit language does not specify the date that the deposit would be due, that omission does not negate the plain meaning of the agreement.

I conclude that the provisions of the lease agreement regarding interim rent and a deposit are unambiguous. Interpreting the plain meaning of the agreement, Marshfield was obligated to tender payment to Amplicon for interim rent and a deposit. Because Marshfield failed to tender these payments, it breached the terms of the lease agreement.

*Attorney's Fees*

Amplicon requests attorneys' fees and costs in this case. Paragraph 17 of the lease agreement provides: "If any party to this Lease brings any action to enforce any of the terms of this Lease or to recover for a breach of this Lease, then the prevailing party shall be entitled to recover all attorneys' fees and costs of suit from the other party."

As the prevailing party, Amplicon is entitled to attorneys' fees and costs under the plain language of the lease agreement.

*Damages*

Because the parties dispute issues relevant to damages and because the issues with respect to damages have not been briefed adequately, a hearing will be sched-

---

**2.** Marshfield argues that Amplicon "changed the deal" when, in Amplicon's Notice of Assignment to Deutsche, it filled in a date of "5/01/91" as the date that the first rental payment was to be directed to Deutsche, and indicated that 47 monthly payments remained. Marshfield had tendered to Amplicon a check stub that read that it was to applied to the first month's pay-

ment. Because monthly payments were to commence at the next calendar quarter, April 1, Amplicon indicated correctly that 47 payments were due as of May. As I pointed out earlier, Amplicon was within the provisions of the agreement when it filled in applicable assignment dates.

uled on damages. Prior to that hearing, however, I will hold a status hearing by telephone in this case.

## ORDER

IT IS ORDERED that plaintiff's motion for summary judgment as to Marshfield's liability under the lease agreement is GRANTED.

IT IS FURTHER ORDERED that plaintiff's motion for attorneys' fees is GRANTED.

FINALLY, IT IS ORDERED that a status hearing will be held in this case on Wednesday, February 5, 1992 at 3:00 p.m. Counsel for Marshfield shall be responsible for placing the call.