**MBI ACQUISITION PARTNERS, L.P., Plaintiff,**

v.

**The CHRONICLE PUBLISHING COMPANY and Richard Suomala, Defendants.**

No. 01–C–0177–C.

United States District Court, W.D. Wisconsin.

Aug. 16, 2002.

William M. Conley, Madison, WI, for plaintiff.

James A. Friedman, La Follette, Godfrey & Kahn, S.C., Madison, WI, for defendants.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary relief in which plaintiff MBI Acquisition Partners, L.P., contends that defendants The Chronicle Publishing Company and Richard Suomala fraudulently induced plaintiff to enter into a contract by failing to disclose the accurate value of unprocessed returns and the existence of a warehouse used to store unprocessed returns and by representing expressly that the current level of unprocessed returns was consistent with historical levels.

Plaintiff alleges six causes of action: (1) violation of federal securities law, § 10(b) and rule 10b–5 of the Securities Exchange Act; (2) violation of Wisconsin securities law, Wis. Stat. §§ 551.41 (fraudulent practices: sales and purchase) and 551.59 (general provisions: civil liabilities); (3) violation of Wis. Stat. § 100.18(1) (marketing; trade practices: fraudulent representations); (4) common law fraudulent inducement; (5) violation of Rule 20(a) of the Securities and Exchange Act; and (6) fraudulent representation under Wis. Stat. §§ 895.80 and 943.20. Subject matter jurisdiction is present. *See* 28 U.S.C.

§ 1331. Supplemental jurisdiction is present over state law claims. *See* 28 U.S.C. § 1367.

Presently before the court is defendants' motion for summary judgment. I conclude that the economic loss doctrine precludes a portion of plaintiff's state law claims and that Ann Eklund had neither actual nor apparent authority to act on behalf of defendant Chronicle. Therefore, defendants' motion for summary judgment will be granted as to (a) plaintiff's claims under Wis. Stat. § 100.18 (third count), common law fraud (fourth count) and Wis. Stat. §§ 895.80 and 943.20 (sixth count) and (b) defendant Chronicle's liability for Eklund's representations under the agency theory of apparent authority. I will deny defendants' motion for summary judgment in all other respects because genuine issues of material fact are in dispute.

Because so many facts are in dispute and this case is proceeding to trial, I will not address the full panoply of the parties' facts, which number 558. Instead, in order to put the dispute into context, and for no other purpose, I have culled the following undisputed facts from the parties' proposed findings of fact.

## SELECT UNDISPUTED FACTS

### A. *Parties*

Plaintiff MBI Acquisition Partners, L.P. is a Delaware limited partnership with its principal place of business in New York, New York. Defendant The Chronicle Publishing Company is a Nevada corporation with its principal place of business in Oakland, California. Defendant Richard Suomala was a citizen of Minnesota at the time this lawsuit was filed and is currently a citizen of Arizona. He was the vice president, chief financial officer and business manager of MBI Publishing Company, Inc. from 1992 until mid-March 2000.

### B. *Background*

On February 1, 2000, defendant Chronicle sold MBI Publishing Company, Inc. to plaintiff for $42 million. (For simplicity, I will refer to the entity that was sold as "MBI.") MBI's principal place of business is in Osceola, Wisconsin. MBI is a wholesale distributor of specialty books and calendars, primarily on automotive and related topics. Before the sale, Tim Parker was president and chief executive officer of MBI. He reported to John Sias, president of defendant Chronicle. Defendant Suomala reported directly to Parker and to defendant Chronicle's finance department in its corporate office in San Francisco.

In 1999, defendant Suomala's primary contact at defendant Chronicle was Cathy McHugh, corporate controller and treasurer of defendant Chronicle. Defendant Suomala was responsible for the preparation of MBI's financial and accounting reports. He prepared these reports as requested by defendant Chronicle, including accounting reports that were sent to defendant Chronicle each month, generally to McHugh's attention. In 1999, defendant Suomala sent his "analysis page" to McHugh and Sias. The analysis page was an overview with one or two sentences explaining variances. McHugh did not know the formula used by Suomala to set return reserves.

During the times relevant to this lawsuit, Ann Eklund was director of operations at MBI. Sylvia Kuske has been employed by MBI as an accounting and trade order entry supervisor since 1990; she has been the accounting supervisor since 1996. From approximately June 1996 to March 17, 2000, Kuske reported to defendant Suomala. During the relevant times, Paula Tonnar was employed by MBI as an accounting assistant. From January 1999 to March 17, 2000, Tonnar reported to

Kuske. Both Tonnar and Kuske are still employed at MBI.

### C. *Sale and Purchase Agreement*

#### 1. *The sale*

Defendant Chronicle was a 100% shareholder of MBI before it sold MBI to plaintiff. As part of the dissolution, defendant Chronicle hired Donaldson, Lufkin & Jenrette to auction off MBI.

On July 26, 1999, Donaldson, Lufkin & Jenrette invited Straden and Flagship to participate in the auction process. David Straden, president of Flagship Partners, L.P., is the controlling shareholder of MBI Acquisition Corporation, which is plaintiff's general partner. Straden is experienced in the financial area and had worked as an investment banker for years before forming his own firm. Straden had participated in auctions for several other companies before purchasing MBI.

As controlling shareholder of plaintiff's general partner, Straden employed others to gather information regarding the acquisition of MBI in order to make a purchase decision on plaintiff's behalf. Ultimately, Straden was responsible for gathering and evaluating all the information.

On or about September 27, 1999, Donaldson, Lufkin & Jenrette requested bids from certain prospective purchasers of MBI, informing them that their proposals were to be accompanied by a mark-up of the purchase agreement and disclosure schedules.

Before submitting a final proposal, Straden performed detailed financial modeling, including a detailed profit and loss model and a projection model. The models contained historical balance sheet information, historical profit and loss information and various financial and capital structure assumptions. Relying on these models, Straden developed an offering price of $46 million.

On or about October 12, 1999, Straden submitted a $46 million final proposal on Flagship's behalf for the purchase of MBI, together with a mark-up of the purchase agreement and disclosure schedules. While Straden was negotiating MBI's purchase, he knew that defendant Chronicle was winding down MBI's affairs.

On November 5, 1999, the parties entered into a share purchase agreement under which plaintiff agreed to pay defendant Chronicle $46 million for all of the outstanding stock of MBI. By letter agreement dated December 29, 1999, the parties amended the agreed purchase price from $46 million to $42 million. The purchase price was renegotiated in the wake of information that MBI's performance in October 1999 was almost $1 million behind budget, its year-to-date revenue was approximately $2 million behind budget and its earnings before interest, taxes, depreciation and amortization were approximately $700,000 behind budget.

On February 1, 2000, plaintiff purchased the outstanding stock of MBI for $42 million.

#### 2. *The purchase agreement*

The share purchase agreement contains the following clauses:

1.1 (v) *"knowledge of the Company," known to the Company* and phrases of similar import mean, with respect to any matter in question relating to the Business or the Company, if John Sias, the President and Chief Executive Officer of the Seller, Marty Jaffe, the Chief Financial Officer of the Seller, W. Ronald Ingram, the General Counsel of the Seller, Tim Parker, the President of the Company, or Richard Suomala, the Treasurer of the Company, have actual knowledge of such matter without obligation of inquiry.

1.1 (x) *"Liability"* means any direct or indirect debt, obligation or liability of any kind or nature, whether accrued or fixed, absolute or contingent, determined or determinable, matured or unmatured, and whether due or to become due, asserted or unasserted, or known or unknown.

1.1 (z) *"Material Adverse Effect"* means any change ... or effect that is materially adverse to the assets, liabilities, properties, operations, business, condition (financial or otherwise), or results of operations of the Company ... except for any such changes, events, occurrences or effects resulting directly or indirectly from ... changes in conditions generally applicable to the book and calendar publishing industry, or in general economic conditions in the geographic regions in which the Business is conducted.

4.13 *Financial Statements.* Attached to *Schedule 4.13* hereto is a true, correct and complete copy of the following financial statements (collectively, the *"Company Financial Statements"*): (I) the unaudited balance sheet of the Company (the *"Latest Balance Sheet"*) as of August 31, 1999 (the *"Latest Balance Sheet Date"*), and the related unaudited statement of income for the eight (8) month period then ended, and (ii) the unaudited balance sheet of the Company as of December 31, 1998, 1997 and 1996, and the related unaudited statement of income for the years then ended. Each of the Company Financial Statements is derived from the books and records of the Seller and the Company (which are accurate and complete in all material respects) and the audited consolidated financial statements of the Seller (which were prepared in accordance with GAAP), and fairly present, in all material respects the assets and Liabilities of the Company and the results of opera-

tions for the respective periods then ended.

4.14 *No Undisclosed Liabilities.* The Company has no Liabilities other than (i) Liabilities reflected on the Latest Balance Sheet, (ii) Liabilities incurred in the ordinary course of business after the Latest Balance Sheet Date, none of which is material to the ... condition (financial or otherwise) of the Company ... and (iv) Liabilities that individually or in the aggregate, have not and would not reasonably be expected to have a Material Adverse Effect.

6.1 *Conduct of Business.*

(a) ... the Seller shall cause the Company to ... (a) conduct the operations of the Company ... in the ordinary course of business and consistent with past practices ... (d) maintain the books of account and records of the Company ... in the usual, regular and ordinary manner and consistent with past practices, and (e) not take any action that would result in a breach or inaccuracy in (in each case as of Closing) any of the representations and warranties of the Company contained in *Article IV* hereof.

(b)... the Company ... shall not take, or cause to be taken, and the Seller shall not permit that Company ... to take, or cause to be taken, any of the following actions to ... (v) make any change in the accounting methods or practices of the Company, or make any changes in depreciation or amortization policies or rates adopted by the Company.

6.2 *Access and Information....* the Seller and the Company shall permit Purchaser ... to have reasonable access ... to all Business Employees ... and shall furnish to the Purchaser ... such information and data, financial records and other documents relating to the

Company as the Purchaser ... may reasonably request.

7.1 ... All representations and warranties of the Seller and the Company contained in this agreement shall be true and correct in all material respects at and as of the Closing with the same effect as though such representations and warranties were made at and as of the Closing (other than any representations or warranty that is expressly made as of a specified date, which shall be true and correct in all material respects as of such specified date only).

### D. *Unprocessed Returns*

When B. Dalton and Barnes & Noble returned individual cartons of books to MBI's warehouse on Prospect Avenue in Osceola, the returns were placed on skids. Once a skid of return cartons from these vendors was assembled, it would be shrink-wrapped, labeled and dated to await processing. MBI received some returns already on skids. MBI also labeled and dated these skids.

In 1999, MBI implemented a new computer system called Cis.pub. The implementation of Cis.pub took longer than expected and was accompanied by numerous processing failures. At some point, MBI discontinued computerized processing of returns for two to three months although it was able to process a limited number of returns manually. The system was unable to issue credit memos appropriately. As a result of these computer problems, MBI developed a backlog of unprocessed returns.

From October 1999 to March 2000, MBI's warehouses on Prospect Avenue (Osceola) and in Star Prairie were out of space in part because there were so many unprocessed returns. MBI arranged to store unprocessed skids of returns at a Jensen Transfer Company warehouse located about two miles from MBI's offices in Osceola. Under an oral agreement with Eklund, Charlie Jensen agreed to provide warehouse space for MBI on a month-to-month basis. MBI used between 1,000 and 1,500 square feet of space in Jensen's warehouse and was billed every month for "warehouse rent," which was calculated on the basis of square footage. Over a six-month period, MBI paid Jensen a total of $1,416.25 for the storage space ($200 for October 1999, $200 for November, $216.25 for December, $300 for January 2000, $300 for February and $200 for March). Jensen did not use MBI's space for his own use. MBI had free access to its space upon request. Defendants did not provide plaintiff with any information regarding the Jensen warehouse.

The total sales value of the returns received in 1999 and January 2000 but processed after January 31, 2000, is $1,214,601.60. The total sales value of the returns received as of December 31, 1999, but processed in 2000 is $1,038,799.47. These figures indicate that returns had increased from the previous year and that the returns reserve was underfunded.

The unprocessed returns as of December 31, 1999, caused the accounts receivable to be overstated in MBI's balance sheet. The August 31, 1999 financial statement is the only 1999 financial statement that defendant Chronicle warranted to be true, accurate and complete under the purchase agreement.

Defendant Suomala prepared monthly financial reports and presented them to Parker. In the summer of 1999, after defendant Suomala learned that a backlog of unprocessed returns had developed because of problems with the Cis.pub system, he began including a line item in his monthly reports relating to this backlog. The line item reflected defendant Suomala's estimate of the value of the unprocessed returns for two of MBI's largest

customers, Borders and Barnes & Noble. The estimate was based on "chargeback" documents, which reflect the customer's belief as to the amount of the unprocessed returns as reported by the customer. A number of customers take chargebacks, including Advanced Marketing, Amazon.com, American Wholesale, Barnes & Noble, including its B. Dalton entity, Baker & Taylor, B & N Distributing, Borders, Hastings, Ingram, Levy Home, Musicland, Partners Book and Waldenbooks.

### E. Due Diligence

In November 1999, Straden hired PriceWaterhouseCoopers to assist Flagship with its due diligence investigation before the MBI closing. Stephen Walmsley was plaintiff's due diligence adviser from PriceWaterhouseCoopers. During the investigation, plaintiff was granted access to MBI's senior management and operational personnel and to MBI's business records, including monthly operational reports and weekly management meetings.

In early November 1999, Walmsley visited MBI's headquarters in Osceola and interviewed members of MBI's management, including defendant Suomala and Eklund. MBI employees discussed the backlog of unprocessed returns with Walmsley. (The parties dispute the content of these discussions.) The issue of unprocessed returns concerned Walmsley in part because the failure to process returns made it difficult for him to establish the underlying trend in the level of sales returns and to know whether the level of unprocessed returns was increasing or decreasing.

During Walmsley's visit to MBI, defendant Suomala noted a problem with accounts receivable caused by the electronic data interchange software (not to be confused with the Cis.pub software) that MBI used to invoice its customers electronically. Either on the telephone or during Walmsley's second visit to MBI, defendant Suomala told Walmsley that this computer problem had been fixed and that there were just one or two customers to whom MBI had to send new invoices.

As of October 1999, the returns reserve totaled $1,382,000. If the gross sales amount of unprocessed returns had been $400,000, the returns reserve would have been funded adequately.

During Walmsley's first visit to MBI in November 1999, defendant Suomala gave PriceWaterhouseCoopers representatives reporting packages for a number of months. (It is unclear whether the reference to "PriceWaterhouseCoopers representatives" includes Walmsley.) Walmsley does not recall reviewing any monthly reports that included a "line item [that] reflected Suomala's estimate of the value of the unprocessed returns for two of MBI's largest customers, Borders and Barnes & Noble." Walmsley stated that he is not "100 percent certain" that he did not see these reports, although he is "fairly confident" that he never saw them. Defendant Suomala's reports stated that the numbers for MBI's accounts receivables would be adjusted downward after the returns were processed. The reports disclosed that the charges would be taken against the returns reserve as the backlog was cleared. In each of the monthly reports from June to December 1999, defendant Suomala noted the backlog of unprocessed returns and estimated the value of the Borders and Barnes & Noble chargebacks. Defendant Suomala understood that until the boxes of unprocessed returns were opened, he would not know the actual value of the returns. Although defendant Suomala included chargeback information from Borders and Barnes & Noble on his management reports as a proxy for the value of unprocessed returns, he did not include other customer chargebacks, even though he could have reviewed the chargeback totals for these customers on his computer

and provided an estimated value of those chargebacks taken but not yet recognized by MBI. Defendant Suomala believed that it would be inappropriate to make an adjustment to accounts receivable or other line items on MBI's financial statements on the basis of speculative information. He posted these chargebacks in the general ledger under accounts receivable. Walmsley and plaintiff's expert witness, Ralph Ells, testified that until the boxes of unprocessed returns were processed, it was impossible to determine the exact dollar value of the returns.

On November 17, 1999, PriceWaterhouseCoopers faxed a draft report to Straden, summarizing its preliminary due diligence findings. The report included a footnote stating that "[m]anagement represented that approximately $200K of actual returns have not yet been booked as of October 1999 due to a backlog in processing as a result of the Cis.pub conversion." According to Walmsley, this footnote reflected his conversation with defendant Suomala regarding unprocessed returns.

On November 23, 1999, PriceWaterhouseCoopers sent plaintiff its final due diligence report, which Straden received and reviewed. The report included a footnote stating that "approximately $200K of actual returns have not yet been booked as of October 1999 due to a backlog in processing as a result of the Cis.pub conversion. After these returns have been booked, the reserve balance will therefore be approximately $1,182[,000] which is consistent to prior years." According to Walmsley, this footnote reflected his conversation with defendant Suomala regarding the impact of unprocessed returns on the return reserve. The $200,000 of "actual returns" in the PriceWaterhouseCoopers reports represents approximately $400,000 in gross sales. The $400,000 gross sale figure represents approximately 40% of the total amount of unprocessed returns ($1,038,-799.47) that plaintiff contends defendants should have disclosed before closing. Walmsley agreed with Straden that during Walmsley's second visit to MBI, Walmsley would ask about MBI's progress in processing the returns.

During Walmsley's second visit to MBI in January 2000, he asked defendant Suomala whether MBI had made any progress on the returns. Suomala said that he did not know specifically but that Eklund would have a better idea. Suomala added that his understanding was that the value was lower than in October 1999. During a tour of the Osceola (Prospect Avenue) warehouse, Walmsley asked Eklund whether unprocessed returns were segregated from other inventory. While looking at a group of skids, Walmsley asked Eklund whether these were unprocessed returns, and Eklund replied, "Yes."

When Eklund and Walmsley were at the Star Prairie facility, Eklund said that all of the returns had been moved out of Star Prairie and "so they were back in Osceola." Eklund never stated that the unprocessed returns were moved to Jensen's warehouse rather than the Prospect Avenue warehouse, both of which are in Osceola. Eklund did not believe that Walmsley might have the erroneous impression that all of the unprocessed returns were at the Osceola (Prospect Avenue) warehouse.

In January 2000, Walmsley noticed that the overall level of accounts receivable had increased and he asked defendant Suomala for an explanation. Defendant Suomala stated that it was a seasonal factor because of the holidays. Defendant Suomala never stated that this was the sole reason.

### F. *David Straden*

Straden visited MBI in early September 1999 and attended a full-day meeting with the MBI management team. During the meeting someone asked whether there was anything new or different in regard to the

business. (According to Straden, no one said that MBI was behind in processing returns or that MBI had a backlog not reflected in MBI's financial statements. According to defendant Suomala, either he or Parker told Straden that there was a backlog of unprocessed returns because of the Cis.pub problem.)

In December 1999, Straden had a phone conversation with defendant Suomala and Parker in which they discussed the accounts receivables, the collectibility of these receivables and the adequacy of the returns reserve and accounts receivable reserve. During the conversation, Straden said that he believed that MBI should make entries to increase the reserves for bad debt and returns. In response, defendant Suomala said that MBI had adequate reserves and that it was proceeding with its normal processes and historical activities. Defendant Suomala never told Straden that it was impossible to estimate the value of the unprocessed returns without physically opening the boxes.

In January 2000, Straden spoke with McHugh and defendant Suomala on the telephone to learn why the actual accounts receivable were greater than budgeted and whether these receivables could be collected. (According to Straden, defendant Suomala attributed the numerical discrepancies solely to the electronic data interface problem. According to Suomala, he stated that unprocessed returns and seasonality were also factors.) Suomala said more than once that the receivables could be collected and that there were no material problems. Defendant Suomala also noted in his monthly analysis reports that accounts receivable would decrease after the returns had been processed. Straden received at least one of these reports. At no time during these conversations did defendant Suomala or any other person tell Straden that the accounts receivables had

grown because of a significant number of unprocessed returns.

## OPINION

Defendants' assertions in support of their motion for summary judgment boil down to seven arguments.

### A. *Straden's Testimony*

◼ Defendants assert that David Straden testified that he was told "absolutely nothing" of the "large" numbers of unprocessed returns. Defendants assert further that Straden's testimony is replete with such "unequivocal" statements as "plaintiff was not aware that there were *any* unprocessed returns." Dfts.' Mot. for Summ. J., dkt. # 67, at 12 (emphasis in original). In other words, defendants argue that plaintiff's testimony is inconsistent because on the one hand, Straden states he knew nothing of any unprocessed returns while on the other hand, plaintiff "concedes" it knew of $400,000 in unprocessed returns. In addition, defendants argue that plaintiff is "reframing" its case as a dispute over the accuracy of the estimates regarding the value of the unprocessed returns. Defendants are wrong. Plaintiff has not reframed its case and Straden's testimony is far from "unequivocal."

First, as to the alleged reframing of the case, plaintiff alleged in its complaint that defendants "intentionally and/or recklessly fail[ed] to disclose to [p]laintiff the existence of $1 million in unprocessed customer returns." Cpt., dkt. # 2, at 2; Am. Cpt., dkt. # 59, at 2. In their briefs, the parties dispute (1) the alleged $400,000 valuation by defendants of the unprocessed returns and (2) the failure to disclose the physical location of the unprocessed returns in the Jensen and Star Prairie warehouses. With respect to the unprocessed returns, plaintiff alleges that defendant Suomala told plaintiff's due diligence adviser, Stephen Walmsley, that (1) the amount

of unprocessed returns totaled approximately $400,000 in sales; (2) a good estimate of the impact these returns would have on revenue would be approximately $200,000, which is the approximate 50% gross profit margin on sales; (3) the unprocessed returns were accounted for in the returns reserve; and (4) the level of returns from November 1999 to January 2000 was "in line with results from prior years." Defendant Suomala does not recall any conversation with Walmsley in which he provided a specific number for the value of the unprocessed returns. The parties dispute further whether Walmsley asked Eklund whether the skids they were looking at in the Prospect Avenue warehouse were the "only" unprocessed returns, to which Eklund answered in the affirmative. Finally, the parties dispute whether Eklund estimated the value of the skids to be between $70,000 and $100,000 and whether defendant Suomala told Walmsley that he agreed with Eklund's estimate. With respect to the physical location of the unprocessed returns, plaintiff alleges that during both of Walmsley's visits to MBI, he confirmed with defendant Suomala and Eklund that the Osceola (Prospect Avenue) warehouse was the "only" warehouse that MBI leased, owned or used to store inventory. Neither defendant Suomala nor Ekund recalls any such conversations. As plaintiff's allegations reveal, its current posture is very much in line with the allegations in its complaint.

Second, as to plaintiff's allegedly inconsistent testimony, defendants' argument that Straden testified that he was unaware of "any" unprocessed returns is mere word play with ambiguous adjectives and relative concepts. When Straden used the words "large" and "substantial" in his depositions, it appears he meant those unprocessed returns *in excess of* $400,000, not that plaintiff was unaware of the $400,000 of unprocessed returns that Walmsley was told about. In fact, the basis for plaintiff's lawsuit is that Walmsley was told that there were approximately $400,000 in unprocessed returns when in fact the returns totaled over $1 million. Simply put, if defendants wanted to ask Straden whether he was aware of "any" unprocessed returns, then that is the question they should have asked. Straden's admission that he knew about the "large" or "substantial" number of unprocessed returns does not amount to an unequivocal statement that he was unaware of "any" unprocessed returns. As to the myriad of disputed conversations surrounding the alleged $400,000 valuation of the unprocessed returns and their physical storage location, it will be up to the factfinder to decide who is telling the truth.

### B. *The Jensen Warehouse*

■ Defendants argue that plaintiff's allegation that defendants failed to disclose MBI's temporary use of a third warehouse to store unprocessed returns is just a variant on its unprocessed returns allegations. I agree. Nevertheless, defendant argues that the warehouse agreement constitutes a bailment, not a lease, and for that reason it need not have been disclosed under the purchase agreement. Under Wisconsin law, a "lease" is defined as "an agreement, whether oral or written, for transfer of possession of real property, or both real and personal property, for a definite period of time .... An agreement for transfer of possession of only personal property is not a lease." Wis. Stat. § 704.01. However, the parties dispute whether Jensen devoted a defined section of the warehouse space to the unprocessed returns. According to Jensen, he did; according to Eklund, he did not. Because this fact is disputed, it is impossible to determine as a matter of law whether Jensen transferred possession of real property (a lease) or merely possession of personal property (a bailment).

Nevertheless, it is not necessary to distinguish between a lease or bailment. As plaintiff contends, even if defendants were not contractually required to disclose the agreement with Jensen because it was a bailment, the central issue is whether failing to disclose the warehouse is yet another representation by defendants that taken together with other misrepresentations and in context would have misled a reasonable investor. Disclosure of the Jensen warehouse agreement is not driven solely by the determination that it was a lease. Instead, it is a question for the factfinder whether defendants' undisputed lack of disclosure of the Jensen warehouse contributed to a misrepresentation of the total amount of unprocessed returns held by MBI.

## C. Economic Loss Doctrine

Defendants argue that the economic loss doctrine bars plaintiff's recovery on its claims under Wis. Stat. § 100.18 (third count), common law fraud (fourth count) and Wis. Stat. §§ 895.80 and 943.20 (sixth count). Plaintiff denies that the doctrine applies to allegations of fraud in the inducement.

■ "Under the economic loss doctrine, Wisconsin law bars tort claims which seek only 'economic losses' related to the commercial transaction." *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 963 (7th Cir.2000) (citing *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis.2d 235, 593 N.W.2d 445, 451 (1999)). The doctrine is based on an understanding that contract law is better suited than tort law for dealing with purely economic loss in the commercial arena. *See Daanen & Jańssen. Inc. v. Cedarapids*, Inc., 216 Wis.2d 395, 400, 573 N.W.2d 842 (1998).

■ Plaintiff cites *A.I Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630 (7th Cir. 2001), a case in which the Court of Appeals for the Seventh Circuit held the economic loss rule inapplicable in a case in which the defendant failed to disclose accurate financial information pertaining to loans. However, *A.I. Credit* applied the law of Indiana, which has refused explicitly to expand the economic loss doctrine to all negligence actions. *Id.* at 636 (citing *Runde v. Vigus Realty, Inc.*, 617 N.E.2d 572, 575 (Ind.Ct.App.1993)). In contrast, the case cited by defendants, *Home Valu*, applied Wisconsin law. *See Home Valu*, 213 F.3d at 964. In *Home Valu*, the plaintiff was alleging negligent, intentional and strict responsibility misrepresentation in a contract to purchase real estate. *Id.* The court recognized that in *Douglas–Hanson Co., Inc. v. BF Goodrich Co.*, 229 Wis.2d 132, 598 N.W.2d 262 (Ct.App.1999), the Wisconsin court of appeals had held that the economic loss doctrine does not prevent a plaintiff's recovery when the defendant's intentional misrepresentation fraudulently induces a party to enter into a contract. *See Home Valu*, 213 F.3d at 964; *cf. Kailin v. Armstrong*, 252 Wis.2d 676, 643 N.W.2d 132 (Ct.App.2002) (economic loss doctrine inapplicable when there is intentional misrepresentation inducing party to enter into contract); *Stoughton Trailers, Inc. v. Henkel Corp.*, 965 F.Supp. 1227, 1236 (W.D.Wis.1997) ("Although the Wisconsin Supreme Court has not addressed whether the economic loss doctrine extends to intentional torts, I am satisfied that it would not extend the doctrine that far."). However, the Court of Appeals for the Seventh Circuit observed that when the state appellate court ruling in *Douglas–Hanson* was appealed to the Wisconsin supreme court, that court was evenly split. *See Home Valu*, 213 F.3d at 964–65 (citing *Douglas–Hanson Co., Inc. v. BF. Goodrich Co.*, 233 Wis.2d 276, 607 N.W.2d 621 (2000)). The court noted that although a tie vote results in an affirmance of the lower court's decision, it does not create binding authority. *Id.* at 965 (citing *Neil v. Biggers*, 409 U.S. 188,

192, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). In the end, notwithstanding the Wisconsin court of appeals' ruling in *Douglas–Hanson* that the economic loss doctrine does not apply to acts of intentional misrepresentation and its subsequent affirmance by the Wisconsin supreme court, the court held in *Home Valu* that Wisconsin's economic loss doctrine barred the plaintiff's intentional misrepresentation claim that it was fraudulently induced to enter the contract with the defendant. *Home Valu,* 213 F.3d at 965. For better or worse, this court is bound by the ruling in *Home Valu. See Donohoe v. Consolidated Operating & Production Corp.,* 30 F.3d 907, 910 (7th Cir.1994) (judges of inferior courts must carry out decisions of superior courts). Accordingly, defendants' motion for summary judgment will be granted as to plaintiff's claims under Wis. Stat. § 100.18 (third count), common law fraud (fourth count) and Wis. Stat. §§ 895.80 and 943.20 (sixth count). Because at this point in the proceedings plaintiff can no longer collect punitive or treble damages as a sanction for discovery violations, *see* Order dated April 16, 2002, dkt. # 94, at 26, this ruling may be a hollow victory for defendants.

### D. *Agency Liability*

#### 1. *State claims*

Defendants argue that under a theory of respondeat superior, defendant Chronicle (the parent) cannot be held liable for alleged misrepresentations made by employees of MBI (its subsidiary). However, plaintiff does not limit its argument to an employee and employer relationship but asserts a principal and agent relationship as well. Specifically, plaintiff argues that defendant Suomala had actual authority to speak to plaintiff regarding financial matters and, therefore, he was defendant Chronicle's agent. In support of its position, plaintiff cites the deposition of Steven Handel, defendant Chronicle's director of accounting and business affairs and one of defendant Chronicle's Rule 30(b)(6) designees. Handel testified that defendant Suomala "was instructed to provide information [to plaintiff] once the deal was signed on a requested basis" and until the closing on February 1, 2000. Defendants object to this testimony, arguing that Handel was designated as a Rule 30(b)(6) designee only as to "returns and inventory levels." *See* Dfts.' Resp. to Plt.'s Prop. Findings of Fact, dkt. 139, at 64–65, ¶ 266. The Rule 30(b)(6) correspondence cited by defendants in support of their objection does not support defendants' assertion that Handel was so limited. In fact, Handel was designated to answer questions regarding "[t]he Chronicle's business operations, structure, and corporate existence including ... activities ... of all ... officers of [t]he Chronicle." Accordingly, I find this testimony admissible.

Moreover, plaintiff cites the testimony of Ronald Ingram, defendant Chronicle's general counsel and another Rule 30(b)(6) designee. Specifically, Ingram answered "yes" to the question whether defendant Suomala was "providing information to the plaintiff in this case with the authority and express knowledge of [defendant] Chronicle." *See id.* at 65, ¶ 271. Defendants object to this proposed fact, contending that it is a legal conclusion and noting that Ingram added the caveat that defendant Chronicle did not know the specific information that defendant Suomala was telling plaintiff or its representatives. (In their briefs, defendants also argue that the provisions of the contract foreclose reliance on statements made outside the purchase agreement. Because this argument is peppered liberally throughout defendants' briefs, I will address it generally later in this opinion in Section F.)

■ "Actual authority is express when found within the explicit agency agreement

itself, that is, the communication or contract between the principal and the agent." *Skrupky v. Elbert*, 189 Wis.2d 31, 44, 526 N.W.2d 264, 269 (Ct.App.1994); *see also Select Creations v. Paliafito America*, 830 F.Supp. 1223, 1233 (E.D.Wis.1993); *Restatement (Second) of Agency* § 7 cmt. c (1958). Therefore, it is not a legal conclusion for Ingram to state that defendant Suomala provided information to plaintiff with defendant Chronicle's authority and express knowledge. This is a fact, which defendant Chronicle concedes is true. However, Ingram's testimony (and Handel's) leads to the legal conclusion that actual authority existed. Therefore, the next question is whether defendant Chronicle (as the principal) can be held liable for the alleged misrepresentations of defendant Suomala (its agent) if it did not know the specifics of the information provided.

"A principal is liable in an action at law for misrepresentations by an agent in the course of transactions authorized or apparently authorized if ... the statement is as to a matter upon which the principal would expect representations to be made and the agent's statement is one which it is not too unlikely that a fraudulent agent might make." *Skrupky*, 189 Wis.2d at 45, 526 N.W.2d at 269. Thus, the fact that Ingram testified with the caveat that defendant Chronicle did not know the specifics of the information defendant Suomala provided is irrelevant because the pertinent query is whether the principal would *expect* such representations to be made. It is for the factfinder to determine whether defendant Suomala's alleged representations regarding the value of unprocessed returns constituted a matter about which defendant Chronicle would expect representations to be made and one not too unlikely for a fraudulent agent to make. If so, defendant Chronicle can be held liable for any misrepresentations by defendant Suomala under the agency theory of actual authority.

Plaintiff contends further that apparent authority exists for representations made by Eklund as well as defendant Suomala. In order to establish apparent authority, a party must show (1) acts by the agent or principal justifying belief in the agency; (2) knowledge by the party sought to be held; and (3) reliance consistent with ordinary care. *Amplicon, Inc. v. Marshfield Clinic*, 786 F.Supp. 1469, 1476 (W.D.Wis.1992) (citing *Larkin v. Johnson*, 67 Wis.2d 451, 457, 227 N.W.2d 90 (1975)). Apparent authority is a question of fact. *Iowa National Mut. Ins. Co. v. Backens*, 51 Wis.2d 26, 34, 186 N.W.2d 196, 200 (1971). "[A]pparent authority results from conduct by the principal which causes a third person reasonably to believe that a particular person, who may or may not be the principal's agent, has authority to enter into negotiations or to make representations as his agent." *Ivers & Pond Piano Co. v. Peckham*, 29 Wis.2d 364, 370, 139 N.W.2d 57, 60 (1966). " '[T]he apparent authority for which the principal may be liable must be traceable to him, and cannot be established solely by the acts and conduct of the agent; the principal is only liable for that appearance of authority caused by himself.' " *Amplicon*, 786 F.Supp. at 1476 (quoting *Sater v. Cities Service Oil Co.*, 235 Wis. 32, 40, 291 N.W. 355, 359 (1940)).

Plaintiff contends that § 6.2 of the purchase agreement standing alone is enough to establish apparent authority as to Eklund. In essence, this provision granted plaintiff reasonable access to all of MBI's employees, books, records, documents and suppliers. Defendants argue that plaintiff failed to proffer any evidence showing that defendant Chronicle represented to plaintiff that all MBI employees could make binding representations on its behalf. I agree. Because § 6.2 merely grants plaintiff *access* to MBI's employees,

no reasonable jury could conclude that plaintiff reasonably believed that this provision conferred *authority* on Eklund to act on defendant Chronicle's behalf. With respect to defendant Suomala, because I have concluded that he had actual authority, it is unnecessary to determine whether he also had apparent authority.

### 2. *Federal securities claims*

■ Defendants argue that (1) plaintiff fails to adduce evidence establishing defendant Chronicle's scienter and (2) defendant Suomala's and Eklund's statements do not bind defendant Chronicle under an agency theory in the realm of a federal securities violation. An initial question is whether the common law is even applicable when a federal statute has been enacted. The Court of Appeals for the Seventh Circuit has stated that "[o]nce Congress has legislated, the common-law rules courts apply to fill interstices fall away." *See Stomper v. Amalgamated Transit Union, Local 241*, 27 F.3d 316, 319 (7th Cir.1994). Nevertheless, when common law doctrines will advance the goals of a federal statute, courts may use the doctrines, provided that the courts "conform [the] implied remedies to the rules Congress devised for the remedies it authorized expressly." *See id.*

■ To establish liability under § 10(b) and rule 10b–5, a plaintiff must prove that "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997).

Plaintiff contends that defendant Chronicle is vicariously liable for defendant Suomala's and Eklund's representations because they were acting as its agents. Defendants allude to the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), as possibly foreclosing plaintiff's agency theory of liability. In *Central Bank*, the Supreme Court held that a private plaintiff could not maintain a claim under § 10(b) for aiding and abetting securities fraud. *Central Bank*, 511 U.S. at 191, 114 S.Ct. 1439. The Court stated that section 10(b) prohibited only the making of a material misstatement or omission or the commission of a manipulative act, and declined to extend the statute to encompass acts that are not themselves manipulative or deceptive. *Id.* at 177–78, 114 S.Ct. 1439. The Court explained that imposing liability for aiding and abetting would allow plaintiffs to circumvent the statute's reliance requirement. *Id.* at 180. Specifically, the Court held that "[w]e cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute." *Id.* at 177–78, 114 S.Ct. 1439.

■ In this case, agency theory is not necessary to implicate defendant Chronicle because plaintiff contends that defendant Chronicle violated federal securities law itself by falsely representing in the purchase agreement that there were no undisclosed liabilities (§§ 4.14 and 1.1(x)) at the time of closing (§ 7.1) when in fact there were approximately $600,000 in additional unprocessed returns. Plaintiff asserts that because it relied on such representations in the purchase agreement, it overpaid defendant Chronicle by $10.4 million for MBI. In other words, plaintiff alleges that defendant Chronicle's own act of entering into a false purchase agreement is a manipulative or deceptive act in and of itself within the meaning of the statute. Plaintiff contends further that defendant

Chronicle had a duty to speak because the purchase agreement was conditioned on the Chronicle's reaffirmation that all non-date specific representations and warranties (such as undisclosed liabilities) were true at the time of closing. *See Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) ("When an allegation of fraud [under § 10(b) ] is based upon nondisclosure, there can be no fraud absent a duty to speak.").

■ In addition, plaintiff alleges that defendant Chronicle violated other provisions of the purchase agreement, including § 4.13, which required the August 31, 1999 balance sheet (the so-called "latest balance sheet") to be accurate. Specifically, plaintiff alleges that defendant Suomala averred in his affidavit that the backlog of unprocessed returns began around June 1999, that MBI stopped processing returns and that he stopped making adjustments to accounts receivable or other line items, other than the returns reserve, until the returns were processed. However, the parties fail to allege the amount of the discrepancy or non-discrepancy in accounts receivables or other line items as of August 31, 1999, caused by unprocessed returns. *See Gallagher v. Abbott Laboratories*, 269 F.3d 806, 810 (7th Cir.2001) (noting that "a statement may be 'corrected' only if it was *in* correct when made") (emphasis in original). Thus, it is impossible to conclude whether the alleged discrepancy in the August 31, 1999 financial statements is material as a matter of law.

■ To establish defendant Chronicle's scienter, plaintiff alleges that defendant Chronicle essentially did no investigation to assure itself that the representations it made in the purchase agreement were true at the time of closing. Defendant disputes plaintiff's proposed facts in support of this allegation. *See* Dft.'s Resp. to Plt.'s Proposed Findings of Fact, dkt. # 139, at 41–43,

¶¶ 163–75. Scienter is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Court of Appeals for the Seventh Circuit has interpreted *Hochfelder* as establishing that "reckless disregard of the truth counts as intent" for the purpose of the 10b–5 scienter requirement. *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) (citing *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044–45 (7th Cir.1977)). At a minimum, reckless conduct is conduct that is "highly unreasonable" and represents "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977). " 'An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness.' " *Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1255 (N.D.Ill.1997) (ellipses in original) (quoting *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.Supp. 256, 259 (S.D.N.Y.1989)). Plaintiff contends that it has proffered sufficient evidence for a jury to conclude that defendant Chronicle acted with scienter. Although this is a close call, I agree with plaintiff.

Nevertheless, even if an agency theory were necessary to implicate defendant Chronicle for federal securities violations, I find persuasive the reasoning of the courts that have held that agency liability survives *Central Bank*. Compare *Krieger v. Gast*, No. 98 C 3182, 1998 WL 677161, at *9 (N.D.Ill. Sept. 22, 1998) (noting "strong reservations about the use of allegations of agency to avoid the result of *Central Bank* " but deciding motion to dismiss section 10(b) claim on other grounds); *War-*

*den v. Crown Am. Realty Trust,* No. Civ. A. 96–25J, 1999 WL 476996, at *4 (W.D.Pa. July 6, 1999) (rejecting agency theory of liability) with *Angell Investments, LLC v. Purizer Corp.,* Fed. Sec. L. Rep. P91668, 2002 WL 23822, *5 (N.D.Ill. Jan. 4, 2002) (agency theory of liability remains viable after *Central Bank*); *Gabriel Capital, L.P. v. NatWest Fin., Inc.,* 122 F.Supp.2d 407, 430–31 (S.D.N.Y.2000) (same); *In re Centennial Techs. Litig.,* 52 F.Supp.2d 178, 185–86 (D.Mass.1999) (same); *Seolas v. Bilzerian,* 951 F.Supp. 978, 983–84 (D.Utah 1997) (same). "[C]ourts imposing liability on agency theories are not expanding the category of affirmative conduct proscribed by the relevant statute; rather, they are deciding on whose shoulders to place responsibility for conduct indisputably proscribed by the relevant statute." *See AT & T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1430–31 (3d Cir. 1994). Moreover, construing *Central Bank* to preclude agency liability would essentially exempt corporations from liability under Rule 10b–5, because such entities can act only through their agents. The Supreme Court could not have intended such a result. Accordingly, the conclusions as to agency liability in the context of plaintiff's state claims apply equally to the federal claims.

### E. *Statute of Limitations: Federal Securities Claim*

Plaintiff asserts that defendants failed to raise statute of limitations as an affirmative defense in their original answers. This is incorrect. *See* Dfts.' Answers, dkt. # 19–20. Moreover, defendants reiterated their statute of limitations defense in their answers to plaintiff's amended complaint. *See* Dfts.' Answers, dkt. # 75–76. Therefore, the question is whether plaintiff's federal securities claim is time-barred.

▮▮▮▮ A claim of federal securities fraud must be brought within one year of discovery of the facts constituting the violation and within three years of the securities transaction itself. *See* 15 U.S.C. § 78i(e); *see also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Plaintiff filed its complaint on March 21, 2001. Plaintiff would be time-barred if it had discovered the facts constituting the alleged violation before March 21, 2000. The clock starts ticking on the date that plaintiff learned facts sufficient to provoke "inquiry." *See Fujisawa Pharm. Co. v. Kapoor,* 115 F.3d 1332, 1334 (7th Cir.1997). Inquiry notice occurs "when the victim of the alleged fraud [becomes] aware of facts that would have led a reasonable person to investigate whether he might have a claim." *Tregenza v. Great American Communications Co.,* 12 F.3d 717, 718 (7th Cir.1993); *see also Fujisawa,* 115 F.3d at 1335 ("The facts constituting [inquiry] notice must be sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated—not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit.").

▮▮▮▮ Plaintiff argues that defendant Suomala did not terminate his employment with MBI until mid-March 2000 and that Suomala's replacement, Carl Fazio, did not notice the unprocessed returns or begin to investigate until mid- or late summer of 2000. Defendants contend that plaintiff was on inquiry notice of the alleged violations before March 21, 2000, because of (1) conversations among Eklund, Parker and Straden concerning the Jensen warehouse that took place at the end of February 2000; (2) a payment in February 2000 for the Jensen storage space; and (3) the processing of large portions of allegedly undisclosed returns in February 2000 that were located in the Star Prairie ware-

house. However, even if Eklund, Parker and Straden discussed the Jensen warehouse at the end of February 2000, defendants offer no evidence to suggest that at this time plaintiff was on inquiry notice that the unprocessed returns *exceeded* $400,000, the crux of plaintiff's fraud claim. *See Fujisawa,* 115 F.3d at 1335 ("We reject the suggestion that the defrauded purchaser of a company is presumed to be on notice of everything in the company's files, so that the statute of limitations begins to run at the moment of the acquisition."). In other words, if the only allegation of fraud that plaintiff complained of in this case was that $400,000 of unprocessed returns were housed at three locations (two of which were undisclosed) rather than one, it would be easy to conclude as a matter of law that such alleged discrepancies would not be material. However, plaintiff is not quibbling over the fact that unprocessed returns were stored at two additional locations. Rather, it is alleging that the unprocessed returns greatly exceeded the $400,000 represented by defendants. Defendants' allegations do not show when plaintiff became aware of facts that would have led a reasonable person to investigate whether the value of the unprocessed returns exceeded $400,000. Accordingly, I cannot conclude that plaintiff had inquiry notice before March 21, 2000.

In addition, defendants cite two documents for the first time in their reply brief, arguing that the documents show that plaintiff had inquiry notice before March 21, 2000. First, defendants note that "Suomala's and Eklund's January reports, which *would have been delivered* on February 12, 2000, both disclosed the returns processing problems, as they had before the sale, and Eklund's report specifically mentions the use of the Jensen warehouse." *See* Dfts. Reply, dkt. # 138, at 49 (emphasis added). Defendants do not assert that these documents *were* delivered but rather use the conditional

phrase, *would have been delivered.* This is not enough to establish inquiry notice.

Second, defendants point to an attachment to a memo sent to a Barnes & Noble representative, which is dated February 10, 2000, and was drafted by Richard Roth, a new member of MBI's senior management team. (Roth's title, position and date of hire are unclear.) The attachment states in a footnote that Barnes & Noble's 1999 return percentage does not "include approximately $480,000 of Barnes & Noble returns in 1999 that [MBI] processed in the first two months of 2000." (It is unclear whether Roth also drafted the attachment.) There are several problems with defendants' reliance on this letter. First and foremost, because defendants cited it for the first time in their reply brief, plaintiff has not had an opportunity to respond. *See James v. Sheahan,* 137 F.3d 1003, 1008 (7th Cir.1998) (arguments raised for first time in reply brief are waived). Second, defendants did not propose any facts as to this memo and attachment in either their original proposed findings of fact or their supplemental facts. Therefore, plaintiff has not had the opportunity to respond to the memo in its response to defendants' proposed facts. Third, even if I could consider the memo notwithstanding these procedural defects, I could not rule as a matter of law that Roth's act of writing the memo constitutes facts sufficiently probative to incite plaintiff to investigate whether the unprocessed returns exceeded $400,000. It is a question of fact for the factfinder whether a reasonable person would have construed the contents of the attachment to this memo as sufficiently probative of fraud to cause a reasonable person to investigate.

### F. *Representations Outside the Purchase Agreement*

Defendants argue that plaintiff could not have relied on representations that were

not made in the share purchase agreement. They made this same argument unsuccessfully in their motion to dismiss. *See* Order dated September 7, 2001, dkt. # 14, at 13–19; *see also Amplicon, Inc. v. Marshfield Clinic,* 786 F.Supp. 1469, 1476 (W.D.Wis.1992) ("When the parties to a contract embody their agreement in writing and intend the writing to be the final expression of their agreement, the terms of the writing may not be varied or contradicted by evidence of any prior written or oral agreement in the absence of fraud, duress, or mutual mistake.") (internal quotation omitted). The parties' proposed facts do not require any different conclusion. Moreover, this ruling has become the law of the case. *See Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) ("when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case").

G. *Accounts Receivable Reconciliations*

▮ Defendants argue in their supplemental brief to their motion for summary judgment that the January 2000 accounts receivable reconciliations show a total of $915,600.99 in unprocessed returns for Borders/Walden ($217,582.80), Barnes & Noble ($378,704.42) and Ingram ($319,-313.77). Defendants point to an eight-page fax dated February 1, 2002, that was allegedly sent by Paula Tonnar to Walmsley in South Carolina, which contains the accounts receivable reconciliation for Borders/Walden and Barnes & Noble. Several problems with the fax puts its authenticity in dispute. First, as plaintiff argues, there is no direct evidence that it was actually faxed to the telephone number written on the cover sheet. For example, there is no fax time stamp at the top of the document or any telephone record indicating that a call was made on that date from MBI to that number. Moreover, the telephone number written on the fax cover sheet is not a PriceWaterhouseCoopers of-

fice, but rather the office of a client of PriceWaterhouseCoopers in South Carolina. Therefore, plaintiff argues, there is no direct evidence it was received by Walmsley even if it had been faxed to the number written on the cover page. Although it is undisputed that Walmsley was at this client's office on February 1, because Walmsley was a visitor, it increases the likelihood that even if the fax had been sent to this location it might not have been given to Walmsley. Second, the alleged fax is dated February 1, 2002, which was the day of the closing. Thus, plaintiff argues, there is no evidence suggesting that it was received by Walmsley before the closing took place. Third, neither Tonnar nor Walmsley is able to say that the document was sent or received. Therefore, whether Walmsley received the fax before the closing is a question for the factfinder.

### ORDER

IT IS ORDERED that the motion of defendants The Chronicle Publishing Company and Richard Suomala for summary judgment is GRANTED in part and DENIED in part. It is GRANTED(a) as to plaintiff's claims under Wis. Stat. § 100.18 (third count), common law fraud (fourth count) and Wis. Stat. §§ 895.80 and 943.20 (sixth count) and (b) as to defendant Chronicle's liability for Ann Eklund's representations under the agency theory of apparent authority. It is DENIED in all other respects.